**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IP GEEKS, LLC, a Washington limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No: |
| DATAREALM INTERNET SERVICES, INC., a Delaware corporation, and ANDREW AUDERIETH, an individual, | ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiff IP Geeks, LLC ("Plaintiff" or "IP Geeks") brings this lawsuit against Defendants Datarealm Internet Services, Inc. ("Datarealm") and Andrew Auderieth ("Auderieth") for (1) breach of contract, and (2) unjust enrichment.

## NATURE OF THE ACTION

1. This complaint stems from Defendants' failure to transfer certain assets to IP Geeks, despite the fact that Defendants entered into a contract with IP Geeks whereby Defendants sold the assets to IP Geeks.

2. On April 10, 2018, IP Geeks entered into an Asset Purchase Agreement (the "APA") with Defendants. A copy of the APA is attached hereto as Exhibit A. Pursuant the APA, Defendants sold to IP Geeks the following assets: (1) equipment, furniture, fixtures, computer hardware and other tangible personal property; (2) all rights, title and interest in certain URLs; (3) customer information, customer lists, mailing lists, email addresses, phone numbers, websites, files, computer data and similar information; (4) trademarks, service marks, trade names, copyrights, patents, domain names and other intellectual properties and trade secrets; (5) all warranties associated with the foregoing; (6) all contracts with Datarealm's clients and customers; (7) all

goodwill associated with the business; (8) custom code developed by Datarealm, (9) non-competition agreements; and (10) certain licenses (the "Acquired Assets').

3.   As alleged more fully below, Defendants breached the APA by failing and refusing to transfer ownership and possession of all of the Acquired Assets to IP Geeks.

4.   Defendants were unjustly enriched by their failure to transfer the Acquired Assets, because IP Geeks paid Defendants in full for the Acquired Assets, but Defendants never transferred all of the Acquired Assets to IP Geeks.

5.   Defendants also committed conversion by improperly retaining possession of certain of the Acquired Assets after the time for performance for the APA had passed.

6.   Through this action, IP Geeks seeks the recovery of the present day value of the assets that were never transferred to IP Geeks (the value of which exceeds $500,000), possession of the assets pursuant to the APA, other damages to be proven at trial, and attorney's fees and costs of this action.

## **PARTIES**

7.   IP Geeks is, and was at all relevant times, a limited liability company duly organized and validly existing under the laws of the State of Washington.  Its principal place of business is located at 150 Riverside Parkway, Suite 206, Fredericksburg, Virginia, 22406. IP Geeks is a subsidiary of Dwarven Holdings, LLC, a limited liability company duly organized and validly existing under the law of the State of Washington.

8.    Defendant Datarealm is a Delaware corporation. Its principal place of business is located at 398 Saint Croix Cove, Hudson, Wisconsin, 54016.

9.   Defendant Andrew Auderieth is a natural person and resident of the State of Wisconsin. Auderieth is the majority shareholder, president, and CEO of Datarealm.

## JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds $75,000 and there is complete diversity with regard to the named parties. Plaintiff paid Defendants $600,000 for certain Acquired Assets but Defendants failed to transfer these assets to Plaintiff. Further, the Plaintiff IP Geeks is domiciled in Washington. Defendant Datarealm is domiciled in Delaware and Wisconsin. Defendant Andrew Auderieth is domiciled in Wisconsin. There is complete diversity because the Plaintiff IP Geeks does not share a state of citizenship with any Defendant.

11. The Court has personal jurisdiction over Defendants pursuant to the forum selection clause within the contract. The APA, attached to this Complaint as Exhibit A, contains a forum selection clause that states:

> ***The Parties hereby submit to the jurisdiction of the State and Federal courts located within the State of Illinois*** for purposes of all legal proceedings which may arise hereunder or under any of the Transaction Documents, agree that all claims in respect of such action or proceeding may be heard and determined in any such court, and agree not    to bring any action or proceeding arising out of or relating to this Agreement or the Transaction Documents in any other court.

(Ex. A, §8.1 (emphasis added)).

12. Venue is proper pursuant to the forum selection clause of the APA:

> ***The Parties hereby submit to the jurisdiction of the State and Federal courts located within the State of Illinois*** for purposes of all legal proceedings which may arise hereunder or under any of the Transaction Documents, agree that all claims in respect of such action or proceeding may be heard and determined in any such court, ***and agree not to bring any action or proceeding arising out of or relating to this Agreement or the Transaction Documents in any other court.***

(Ex. A, §8.1 (emphasis added)).

## GOVERNING LAW

13. New York law governs this action pursuant to an express choice of law provision in the APA. The APA states that "[t]his Agreement [the APA] shall be construed under and governed by New York State Law without regard to the conflicts of laws principles thereof." (Exhibit A, §8.1).

## FACTUAL ALLEGATIONS

14. On April 10, 2018, IP Geeks entered into the APA with both Defendants. (*See* Ex. A). Through the APA, Datarealm, manifested its intention "to sell all or substantially all of [Datarealm's] assets" to IP Geeks. (Ex. A, p. 1 (Recital C)).

15. Pursuant to the APA, Defendants agreed to sell, transfer, assign, and convey to IP Geeks the Acquired Assets, as defined above. (Ex. A, §1.1(a)).

16. The APA specified that Datarealm was required to deliver to IP Geeks good and marketable title to the Acquired Assets, free and clear of all liens, security interests, option agreements and encumbrances of any kind other than liens, taxes, assessments and other governmental charges. (Ex. A, §1.1(b)). Datarealm was also required to transfer to IP Geeks the "exclusive possession" of the Acquired Assets. (Ex. A, §1.1(b)).

17. The sale and assignment of the Acquired Assets was to be evidenced in a bill of sale (the "Bill of Sale") (Ex. A, §1.1(d)). The Bill of Sale was to be executed by Datarealm and delivered to IP Geeks at closing. (Ex. A, §1.1(d)).

18. IP Geeks fully performed all of its obligations under the APA and made all required payments to Defendants under the APA. (Ex. A, §2.1).

19. Pursuant to the APA, IP Geeks and Defendants agreed that the closing of the sale and transfer of the Acquired Assets was to take place as soon as practicable and not later than April 23, 2018. (Exhibit A, §6.1).

20. Pursuant to the APA, at the closing Defendants were required to deliver possession of all the Acquired Assets to IP Geeks.  (Exhibit A, §6.2).  Defendants also were required to deliver the Bill of Sale and all other required documents to IP Geeks at the time of closing.  (Exhibit A, §6.2).

21. Defendants breached the APA by failing to transfer all of the Acquired Assets to IP Geeks.

22. Among other things, Defendants failed to transfer to IP Geeks the Fixed Assets or the Server List, as detailed in Section 1.1 and Schedule 1.1 of the APA.

23. The APA requires that IP Geeks be able to use the Iron Mountain datacenter "in the same manner and extent" as it was used by Datarealm.  (Ex. A, §1.3). Despite numerous attempts, IP Geeks has not been able to access the datacenter, because Defendants failed to transfer ownership of the information in the datacenter to IP Geeks.

24. Defendants failed to transfer "all rights, title and interest in the URLs" to IP Geeks, as required by Schedule 1.2 of the APA.  (Ex. A, §1.1(a)(ii)).  Specifically, Defendants failed to transfer Minerva.net and approximately 8,000 of its accompanying IP addresses to IP Geeks, as required by the APA. (*Id*.). Said IP addresses have a present day value in excess of $500,000.

25. Defendants failed to execute or deliver the Bill of Sale to IP Geeks, as required by §1.1(d) of the APA.

### COUNT I
### BREACH OF CONTACT- ASSET PURCHASE AGREEMENT
#### (Against All Defendants)

26. Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs, as though fully set herein.

27. IP Geeks and Defendants entered into a binding contract (the APA), whereby Defendants agreed to sell all or substantially all of Datarealm's assets to IP Geeks.

28. IP Geeks performed all of its obligations under the contract, including by making all required payments to Defendants.

29. Defendants failed to perform its obligations under the APA by failing to transfer to Plaintiffs all of the Acquired Assets.

30. Defendants' non-performance of its obligations under the Asset Purchase Agreement was not excused.

31. IP Geeks has suffered damages as a result of Defendants' breach. IP Geeks never received all of the Acquired Assets it was promised under the contract. IP Geeks paid $600,0000 to Defendants, but it never received all of the Acquired Assets.

32. Under the APA, the prevailing party in any litigation with regard to the APA is entitled to recovery from the non-prevailing party all reasonable attorneys' fees and costs. Accordingly, in the event IP Geeks prevails in this litigation, Defendants are obligated to pay IP Geeks its attorneys' fees and costs (at pre-trial, trial, and appellate levels). (Ex. A, §8.9).

33. Plaintiff's total damages for breach of the APA will be proven at trial, but, in no event shall they be less than $75,000 (not including costs and attorneys' fees), or according to proof.

34. The APA was subject to an implied covenant of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties – both explicit and fairly implied- and not to prevent performance of the contract or to withhold its benefits from IP Geeks.

35. Defendant Auderieth breached the implied covenant of good faith by retaining assets designated as to be acquired by IP Geeks.

36. IP Geeks has meet all of its contractual obligations under the APA, including paying the entire purchase price to Defendants.

-6-

37. By preventing IP Geeks from ever possessing all the Acquired Assets it purchased through the APA, Defendant Auderieth has prevented the performance of the APA and withheld its specific benefits from IP Geeks. Defendant Auderieth's failure to act in good faith denied IP Geeks the full benefit of the APA.

38. Accordingly, IP Geeks has been injured as a result of Defendant Auderieth's breach of the implied covenant of good faith and fair dealing and is entitled to damages in an amount to be proven at trial.

## COUNT II
### UNJUST ENRICHMENT
### (Against All Defendants)

39. Plaintiff realleges and incorporates by reference the allegations of all of the preceding paragraphs, as though fully set forth herein.

40. Defendants enriched themselves by retaining some of the Acquired Assets they were obligated to transfer to Plaintiff under the APA.

41. Defendants have been enriched at the expense of Plaintiff, because Plaintiff did not receive all of the Acquired Assets it paid for.

42. It would be against equity and good conscience to permit Defendants to retain the Acquired Assets it sold to Plaintiff, or the value thereof, since Plaintiff paid Defendants in full for the Acquired Assets.

43. Upon information and belief, Defendant Auderieth retained approximately 8,000 IP addresses that were part of the Acquired Assets that Plaintiff purchased under the APA.

44. These IP addresses have a present day value in excess of $500,000.

45. Auderieth's enrichment is at the expense of Plaintiff, since Plaintiff paid for the Acquired Assets and has the right to receive them.

46. It would be against principles of equity and good conscience to permit Auderieth to retain the value of the assets that Defendants contractually agreed to sell to Plaintiff.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and enter and order:

A. Finding that Defendants' conduct constitutes a breach of contract.

B. Finding that Defendants were unjustly enriched.

C. Finding that Defendants' conduct constitutes a breach of the implied covenant of good faith and fair dealing.

D. Finding that Defendant Auderieth's conduct constituted conversion.

E. Awarding Plaintiff damages in the amount of the fair market value of the Acquired Assets that Defendants sold to IP Geeks through the APA but never transferred to IP Geeks.

F. Requiring Defendants to immediately transfer to IP Geeks the wrongfully retained assets.

G. Awarding Plaintiff damages for the amounts IP Geeks paid to Iron Mountain for the use of its datacenter for assets that Defendant precluded IP Geeks from accessing.

H. Requiring Defendants to transfer to IP Geeks all the funds derived from Defendants' retention of assets that legally belonged to and should have been possessed by IP Geeks under the Asset Purchase Agreement.

I. Awarding IP Geeks its contractually required costs and attorneys' fees expended in this litigation.

J. Awarding such other and further relief as the Court deems equitable and just.

Dated:  April 8, 2022              Respectfully submitted,

                                               */s/Bradley C. Graveline*
                                               Bradley C. Graveline (6203817)
                                               Rebecca L. Mackin (6290104)
                                               SHEPPARD MULLIN RICHTER &
                                               HAMPTON LLP
                                               70 West Madison Street, Suite 4800
                                               Chicago, IL 60602
                                               Telephone:  312.499.6300
                                               Fax:  312.499.6301
                                               bgraveline@sheppardmullin.com
                                               rmackin@sheppardmullin.com

                                               *Counsel for Plaintiff, IP GEEKS, LLC*

# Exhibit A

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "Agreement") effective as of April _10th, 2018 ("Effective Date") is made by and among IP GEEKS, LLC, a Washington limited liability company ("IP GEEKS" or "Purchaser"), Datarealm Internet Services, Inc., a Delaware corporation ("Company" or "Seller"), and Andrew Auderieth ("Seller's Principal"). IP GEEKS, Company and Seller's Principals may be collectively referred to as the "Parties" and individually as a "Party".

## RECITALS

A.      The Company owns various Uniform Resource Locators (URLs) and operates a web hosting business (the "Business") with its principal office located in Hudson, Wisconsin and its datacenter located in Scottsdale, Arizona.

B.      Seller's Principals are the majority shareholders of the Company;

C.      The Company and the Seller's Principal desire to sell all or substantially all of the Company's assets of the Company and Purchaser desires to purchase the assets all upon the terms and conditions set forth herein.

D.      Ari Kushner, a minority shareholder of the Company, is not primarily employed in the web site hosting industry or does he have material contact with the Company's clients.

## AGREEMENT

**NOW, THEREFORE**, for and in consideration of the foregoing Recitals, the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I – PURCHASE AND RELATED TRANSACTIONS

**1.1      Sale and Purchase of Personal Property**.

(a)      In General.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing (as defined in Section 6.1 below), the Seller shall sell, transfer, assign and convey to the Purchaser, and the Purchaser shall purchase from the Seller, all of the Seller's right, title and interest in and to all of the tangible and intangible personal property used or held for use by the Seller in connection with the Business, excluding the assets set forth on Schedule 1.1(a) (collectively, the "Acquired Assets"), for the purchase price set forth in Section 2.1 hereof, including without limitation the following:

1

(i)     all equipment, furniture, fixtures, computer hardware and other tangible personal property of the Company as set forth on <u>Schedule 1.1</u> (collectively, the "<u>Fixed Assets</u>");

(ii)     all rights, title and interest in the URLs owned by the Company, specifically including those listed on <u>Schedule 1.2</u> (the "<u>URLs</u>");

(iii)     the Company's customer information, customer lists, mailing lists, email addresses, phone numbers, websites, files, computer data, and similar information regardless of the form or medium in which maintained, specifications and all other intangible assets;

(iv)     all trademarks, service marks, trade names, copyrights, patents, domain names and other intellectual properties and trade secrets of the Company with respect to the Business, including, but not limited to the name "Datarealm" and all derivations thereof;

(v)     all warranties associated with any of the foregoing, to the extent that such warranties can be transferred;

(vi)     all contracts with Company's clients and customers, regardless of whether or not they are in writing; and

(vii)     all goodwill associated with the Business.

(b)     <u>Good Title, Freedom from Encumbrances and Exclusive Possession</u>.  At Closing, the Seller shall deliver to the Purchaser (1) good and marketable title to all of the Acquired Assets, free and clear of all liens, security interests, option agreements and encumbrances of any kind or nature other than liens, taxes, assessments and other governmental charges related to the Acquired Assets not yet due and payable, and (2) exclusive possession of the Acquired Assets.

(c)     <u>Customer Colocated Equipment</u>. Purchaser and Seller acknowledge and agree that some of Seller's customers/clients who will be transferred to Purchaser hereunder colocate equipment but purchase bandwidth and power from Seller, and, as a result, such colocated equipment is owned by the customer/client, not Seller.  Purchaser and Seller agree that Seller will provide possession and custody of such equipment to Purchaser at closing or as soon thereafter as practicable, but that such equipment is not included in the Acquired Assets hereunder.

(d)     <u>Execution and Delivery of Sale Documents</u>.  To evidence the Seller's sale and assignment of the Acquired Assets hereunder, the Seller shall, at Closing, execute and deliver to the Purchaser a bill of sale (the "<u>Bill of Sale</u>") and such other documents and instruments as the Purchaser may reasonably request to effect the transactions set forth herein.

**1.2**    **No Assumption of Liabilities.**  Except as specifically provided herein, the Purchaser shall not assume, and will not agree to assume or pay or perform, and the Purchaser shall not be responsible for in any manner, any obligations or liabilities of the Seller, direct or

2

indirect, known or unknown, choate or inchoate, absolute, fixed or contingent, except for assignment of future performance of the client/customer contracts.

**1.3** **Contract With DataCenter**. The Company has a colocation contract with IO (now, Iron Mountain) for the use of the datacenter in Scottsville, Arizona (the "IO Contract"). Purchaser shall be entitled to maintain customers/clients in the Iron Mountain datacenter on a transitional basis from the date of Closing until at least November 30, 2018, pursuant to the IO Contract. Seller and Purchaser will work with Iron Mountain to develop a reasonable transition plan for these services, so that Purchaser shall be able to use the Iron Mountain datacenter in the same manner and extent that it is currently being used by the Company. Purchaser shall pay all datacenter costs for said period. However, Purchaser shall have no liability for the IO Contract for the period after November 30, 2018, unless it expressly assumes such liability.

**1.4** **Retention of Email Addresses.** Purchaser shall make available the email addresses "andrew@datarealm.com" and "joylynn@datarealm.com" under the domain "datarealm.com" to continue to be used for personal use by Andrew Auderieth and his wife, Joylynn Auderieth. These addresses shall remain available for such time as Purchaser retains ownership or control of the domain "datarealm.com." Purchaser shall provide reasonable notice to Andrew Auderieth in the event of a transfer of ownership and control of the domain "datarealm.com." Andrew Auderieth and Joylynn Auderieth shall forward any e-mails received that materially impact Purchaser's business operations or customers to support@datarealm.com within a reasonable time.

**1.5** **Due Diligence**. Purchaser hereby acknowledges and agrees that (a) prior to the Effective Date, it has been given the opportunity to review certain documents containing information regarding the Acquired Assets and (b) it has performed all of its due diligence of the Acquired Assets prior to the Effective Date. Purchaser hereby acknowledges the electronic Excel spreadsheet of March 27, 2018, delivered by email and incorporated by reference herein and defined under Schedule 1.1 as the "Server List" was generated from an online database used in Seller's ordinary course of business. Seller did not perform a manual audit of hardware listed on the Server List. The physical assets referenced on the Server List were made available to Purchase for inspection prior to the Effective Date.

## ARTICLE II – PURCHASE PRICE

**2.1** **_Purchase Price_**. In consideration of the sale by Seller to IP GEEKS of the Acquired Assets and Seller's and Seller's Principals agreement to the restrictive covenants described in Article VII hereof, IP GEEKS shall pay to Seller cash in an amount equal to the sum of Six Hundred Thousand and no/100 U.S. Dollars (US $600,000.00) (the "Purchase Price").

**2.2** **_Closing Payment_**. At Closing, IP GEEKS shall pay to Seller, cash in an amount equal to Four Hundred Fifty Thousand and no/100 U.S. Dollars (US $450,000.00) (the "Closing Payment").

3

**2.3**     *Post-Closing Payment*.  Provided that Seller and Seller's Principals comply with all obligations required hereunder and provided that all warranties and representations made herein remain true and accurate, in all material respects, then ninety days from the date of Closing, IP GEEKS shall pay to Seller, cash in an amount equal to One Hundred Fifty Thousand and no/100 U.S. Dollars (US $150,000.00) (the "Post-Closing Payment"), less any amounts due by Company for any liabilities which were incurred during or relate to the time period on or before the Closing Date, or any other deductions permitted or required hereunder.

**2.4**     *Allocation of Purchase Price*.  The parties agree that Schedule 2.4 sets forth an agreed allocation of the Purchase Price for the Acquired Assets.  Each of the Purchaser and the Seller agree to prepare their respective Internal Revenue Service Forms 8594 with respect to the sale of the Acquired Assets, and to report the transaction for all other federal and state income tax purposes, in a manner that is consistent with the allocation set forth in Schedule 2.4.

## ARTICLE III – REPRESENTATIONS AND WARRANTIES BY SELLER

The representations and warranties of the Seller and Seller's Principals set forth in this Article III or elsewhere in this Agreement, and in any of the Transaction Agreements (as defined below) shall become effective upon the execution of this Agreement and shall survive the for a period of twelve (12) months from the Closing Date (except where indicated otherwise in this Agreement).  The Seller and Seller's Principals jointly and severally represent and warrant that, except as set forth in writing and delivered to Purchaser:

**3.1**     **Authority**.  This Agreement and the transactions contemplated hereby have been authorized and approved by the Seller, and no further action on the part of the Seller is necessary or appropriate with respect to the execution and delivery by the Seller of this Agreement and the other Transaction Agreements, or the consummation by the Seller of the transactions contemplated hereby and thereby.

**3.2**     **Ownership of and Title to Assets**.  The Seller has good and marketable title to all of the assets it purports to own, free and clear of any liens, claims, security interests, pledges, conditional sales agreements, leases, charges and encumbrances of any kind or nature other than liens, taxes, assessments and other governmental charges related to the Acquired Assets not yet due and payable.

**3.3**     **Consents**.  There is no requirement that any party consent to the execution of this Agreement by the Seller or the consummation of the transactions contemplated by this Agreement.

**3.4**     **Approvals**.  There is no requirement applicable to the Seller to make any filing with, or to obtain any permit, authorization, consent or approval of any public body as a condition to the lawful consummation of the transactions contemplated by this Agreement.

**3.5**     **Litigation**.  No litigation of any kind or nature or governmental or administrative investigation or proceeding to which the Seller is a party is now pending or to the knowledge of

4

Seller or Seller's Principals threatened, and to the Seller's Principals' knowledge no claim which has not ripened into litigation or other such proceeding has been made or threatened against the Seller (each, a "Legal Action"). Neither Seller nor either of Seller's Principals know of any basis or grounds for any such suit, action, claim, dispute, investigation or other proceeding that could be expected to involve Seller or that could otherwise relate to the Business. There are no outstanding or unsatisfied judgments, orders, decrees, stipulations or settlements to which the Seller is a party or by which any of their assets or the Acquired Assets are bound.

**3.6** **Intellectual Property.** Schedule 3.6 contains a complete listing of all trade names, trademarks and service marks, patents, patent rights, copyrights, whether domestic or foreign (as well as applications, registrations or certificates for any of the foregoing), inventions, trade secrets, proprietary processes, software and other industrial and intellectual property rights (collectively, "Intellectual Property") used or necessary in connection with the Business and all license, coexistence and other agreements relating thereto. The Seller owns or otherwise has the full right to use all the Intellectual Property listed on Schedule 3.6. The Seller's use of the Intellectual Property listed on Schedule 3.6 does not create a material conflict with the rights of others and the Seller has not received any notice of any claimed conflict with respect to any of the foregoing. Furthermore, to the knowledge of the Seller and Seller's Principals, no third party is infringing upon the rights of the Seller in the Intellectual Property.

**3.7** **Clients.** No information has been brought to the attention of the Seller or Seller's Principals which might reasonably lead the Seller to believe that any material customer of the Business intends to terminate its relationship with the Company. For purposes of the foregoing sentence, a "material customer" is a customer or client who has provided more than five percent (5%) of the Company's annual revenue for the year 2017, 2016 or 2015.

**3.8** **Company Financial Statements**. The Company had gross revenues in excess of $499,000 for the year ending December 31, 2017. All Financial Statements provided to IP GEEKS prior to Closing are true and complete in all material respects. The Company Financial Statements are true and complete and have been prepared in accordance with accounting principles consistently applied on a cash or income tax basis and are consistent with the books and records of Company.

**3.9** **Absence of Undisclosed Liabilities.** Except as (i) provided in the Company Financial Statements, (ii) disclosed in writing to IP GEEKS, or (iii) incurred by Company in the ordinary course of Company's business: (1) the Company has no liability of any nature, whether accrued, absolute, contingent or otherwise asserted or unasserted, known or unknown and whether due or to become due (including without limitation, liabilities as guarantor or with respect to obligations of others, or liabilities for taxes due or then accrued or to become due or contingent or potential liabilities); and (2) as of the Effective Date, Company does not have any liabilities of any nature, whether accrued, absolute, contingent or otherwise, asserted or unasserted, known or unknown and whether due or to become due (including without limitation, liabilities as guarantor or otherwise with respect to obligations of others, or liabilities for taxes due or then accrued or to become due or contingent or potential liabilities).

5

**3.10** ***Financing Statements***. There are no financing statements under the Uniform Commercial Code, which name Company as debtor or lessee, filed in any jurisdiction, nor are there any other security interests, liens or encumbrances affecting the Acquired Assets.

## ARTICLE IV – REPRESENTATIONS AND WARRANTIES BY PURCHASER

The representations and warranties of the Purchaser set forth in this Article IV and in the other Transaction Agreements shall become effective upon the execution of this Agreement and shall survive the execution of this Agreement for a period of twelve (12) months from the Closing Date. The Purchaser represents and warrants each of the following to the Seller and Seller's Principals:

**4.1** **Authority.** This Agreement and the transactions contemplated hereby have been authorized and approved by the Purchaser, and no further action on the part of the Purchaser is necessary or appropriate with respect to the execution and delivery by the Purchaser of this Agreement and the other Transaction Agreements, or the consummation by the Purchaser of the transactions contemplated hereby and thereby.

**4.2** **Consents.** There is no requirement that any party consent to the execution of this Agreement by the Purchaser or the consummation of the transactions contemplated by this Agreement.

**4.3** **Litigation and Claims.** Purchaser is not a party to, nor is there any pending or overtly threatened litigation or other legal proceeding or governmental investigation against Purchaser challenging the validity or propriety of, or seeking to enjoin or set aside Purchaser's:

signing and delivery of this Agreement;

consummation of the transactions contemplated by this Agreement; or

performance of Purchaser's obligations under this Agreement.

**4.4** **Approval and Filing.** The Purchaser is under no obligation to obtain any approval, authorization or consent from, or to make any registration or filing with, any federal, state or local government agency or authority in connection with this Agreement or the transactions contemplated herein.

**4.5** **Breach of Representations and Warranties.** Promptly upon IP GEEKS becoming aware of any breach, or the impending or threatened occurrence of any event which would cause or constitute a breach, or would have caused or constituted a breach had such event occurred or been known prior to the Effective Date, of any of the representations and warranties of IP GEEKS contained in or referred to in this Agreement, IP GEEKS shall give detailed written notice thereof to Seller and shall attempt to prevent or promptly remedy the same.

## ARTICLE V – INDEMNIFICATION

**5.1** **Covered Liabilities.** For purposes of this Agreement, "Covered Liabilities" means any and all losses, liabilities, fines, damages, obligations, payments (including but not limited to those arising out of any demand, assessment, settlement, judgment, or compromise relating to any Third Party Claim (as defined in Section 5.4) for which the Indemnifying Party (as defined in Section 5.4) is responsible), costs, and expenses (including but not limited to interest and penalties due and payable with respect thereto and reasonable attorneys' fees and any other reasonable out-of-pocket expenses actually incurred in investigating, preparing, defending, avoiding, or settling any Third Party Claim or in investigating, preserving, or enforcing another party's obligations hereunder). In no event shall either the Seller Parties or Purchaser be liable for consequential, indirect, incidental, punitive, or exemplary damages, including lost profits.

**5.2** **Indemnification of Purchaser.** The Seller Parties shall, on demand, jointly and severally indemnify and hold harmless the Purchaser from and against any and all Covered Liabilities that are incurred by or asserted against the Purchaser arising directly or indirectly from any of the following:

(a) any material breach, default, or violation by any Seller Party of a covenant, agreement or warranty set forth in this Agreement or any of the Transaction Agreements; or

(b) any material misrepresentation by any Seller Party in this Agreement or any of the Transaction Agreements.

**5.3** **Indemnification of the Seller.** The Purchaser shall indemnify and hold harmless the Seller from and against any and all Covered Liabilities that are incurred by or asserted against the Seller, or either of them, arising directly or indirectly from any of the following:

(a) any material breach, default or violation by Purchaser of a covenant, agreement, representation or warranty set forth in this Agreement or any of the Transaction Agreements;

(b) any material misrepresentation of fact by Purchaser in this Agreement or any of the Transaction Agreements; or

(c) the Purchaser's use of the Acquired Assets or Purchaser's operation of the Business following the Closing.

7

**5.4**     **Notice and Defense of Claims.**

(a)     Promptly after receipt by a party seeking indemnification hereunder (an "Indemnified Party") of notice of any claim or the commencement of any action, or upon discovery of any facts which an Indemnified Party believes may give rise to a claim for indemnification hereunder (a "Claim"), such Indemnified Party shall, if a Claim is to be made against a party from whom indemnification is sought hereunder (an "Indemnifying Party") give written notice to the Indemnifying Party of the Claim and the facts, in reasonable detail, constituting the basis for such Claim and the total amount of loss anticipated (including any costs or expenses which have been or may be reasonably incurred in connection therewith). Failure of an Indemnified Party to give such written notice of any Claim shall release an Indemnifying Party from its indemnification obligations hereunder only to the extent that such failure prejudiced the Indemnifying Party's ability to defend a Claim.

(b)     The obligations and liabilities of an Indemnifying Party to an Indemnified Party with respect to claims resulting from the assertion of liability by those not parties to this Agreement (including governmental claims for penalties, fines and assessments) shall be subject to the following conditions:

(i)     If any complaint, claim, prosecution, suit, action, investigation or other proceeding is brought by a third party against an Indemnified Party (a "Third Party Claim"), the Third Party Claim may be defended by the Indemnifying Party with legal counsel of its choice reasonably satisfactory to the Indemnified Party so long as (a) the Indemnifying Party notifies the Indemnified Party in writing within fifteen (15) business days after the Indemnified Party has given notice of the Third Party Claim that the Indemnifying Party acknowledges its indemnity obligation pursuant to the terms of this Article V and assumes the defense of the Third Party Claim; (b) the Indemnifying Party provides the Indemnified Party with evidence reasonably acceptable to the Indemnified Party that the Indemnifying Party will have the financial resources to defend against the Third Party Claim and fulfill its indemnification obligations hereunder; (c) if the Seller is an Indemnifying Party, the Third Party Claim does not seek an injunction or other equitable relief against the Purchaser; (d) settlement of, or an adverse judgment with respect to, the Third Party Claim will not, in the reasonable and good faith judgment of the Indemnified Party, establish a precedential custom or practice adverse to the continuing business interests of the Indemnified Party; and (e) the Indemnifying Party conducts the defense of the Third Party Claim with reasonable diligence.

(ii)     So long as the Indemnifying Party is conducting the defense of a Third Party Claim initiated by a third party in accordance with Section 5.4(b)(i): (A) without the prior written approval of the Indemnified Party, the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to such Third Party Claim unless written agreement is obtained releasing the Indemnified Party from all liability thereunder; (B) the Indemnified Party shall have the right to be represented by advisory counsel and accountants at its own expense; (C) the Indemnifying Party shall keep the Indemnified Party fully informed as to the status of such Third Party Claim at all stages thereof, whether or not the Indemnified Party is represented by its own counsel; and (D) the parties shall render to each other such

assistance as may be reasonably required in order to ensure the proper and adequate defense of such Third Party Claim.

(iii)     In the event any of the conditions in Section 5.4(b)(i) is or becomes unsatisfied, however, the Indemnified Party may upon written notice to the Indemnifying Party assume the defense of the Third Party Claim, and the Indemnifying Party will reimburse the Indemnified Party promptly and periodically for the costs of defending against the Third Party Claim (including reasonable attorneys' fees and expenses) incurred from the date the Indemnified Party assumed defense of the Third Party Claim, and (b) the Indemnifying Party will remain responsible for any Covered Liabilities the Indemnified Party may suffer.

    **5.5**     **Survival.**  The representations and warranties of the parties set forth in this Agreement and the obligations of indemnification set forth in Sections 5.2 and 5.3 hereof shall survive the Closing Date for a period of twelve (12) months; provided that the representations and warranties set forth in Section 3.1  and 3.2 and the obligations of indemnification with respect thereto shall survive indefinitely, and the representations and warranties set forth in Section 3.5 and the obligations of indemnification with respect thereto shall survive for a period of two (2) years after the closing date.  Notwithstanding the provisions of the preceding sentence, if written notice of a claim or demand giving rise to an indemnification obligation is provided to the Indemnifying Party prior to the expiration of the relevant survival period, the obligation of indemnification with respect to such claim or demand shall survive such survival period.

    **5.7**     **Offset.**  In addition to any other remedies available to the Purchaser hereunder, to the extent that any of the Purchaser Indemnified Persons is entitled to be indemnified by the Seller pursuant to this Article V above from any Covered Liabilities, the Purchaser shall have the right, at its option, to (i) withhold monies owed to the Seller up to the amount of such Covered Liabilities, provided however, that a judgment, final adjudication, or final settlement of the claim has been completed; and (ii) offset such Covered Liabilities against any amount payable by the Purchaser to the Seller pursuant to this Agreement.

## ARTICLE VI – CLOSING

    **6.1**     **Time and Place.**  The closing of the sale and transfer of the Acquired Assets (the "Closing") shall take place as soon as practicable after the satisfaction or waiver of the conditions set forth in Sections 6.4 and 6.5 below, but in no event later than April  23, 2018 (the "Closing Date").

    **6.2**     **Deliveries by Seller.**  At the Closing, the Seller shall deliver the following to the Purchaser:

(a)     possession of all of the Acquired Assets;

(b)     the Bill of Sale, and all other agreements, certificates, opinions, instruments and other documents required to be delivered under any of the foregoing documents

or otherwise in order to effect the transactions contemplated hereby and thereby (collectively, the "Transaction Agreements"); and

    (c)    such other documents as may be reasonably requested by the Purchaser.

**6.3**    **Deliveries by Purchaser.** At Closing, the Purchaser shall deliver to the Seller:

    (a)    The Closing Payment;
    (b)    the Transaction Agreements; and

    (c)    such other documents as may be reasonably requested by the Seller.

***6.4***    ***Conditions to the Obligations of IP GEEKS.*** The obligation of IP GEEKS to consummate the Transaction is subject to the fulfillment, prior to or at the Closing, of the following additional conditions precedent:

    (a)    <u>Representations; Warranties; Covenants</u>. Each of the representations and warranties of Seller made pursuant to this Agreement shall be true and correct in all material respects on and as of the Closing Date (it being understood that representations and warranties made as of the Effective Date shall also be deemed to have been made as of the Closing Date); and that Company and Seller's Principals shall, on or before the Closing Date, have performed and satisfied all of their covenants and agreements set forth in this Agreement which by their respective terms are to be performed and satisfied on or before the Closing Date. Seller and Seller's Principals shall have delivered to IP GEEKS a certificate dated as of the Closing Date certifying to the foregoing effect.

    (b)    <u>No Actions or Proceedings</u>. No Action by or before any Governmental Authority shall have been instituted or threatened which seeks to enjoin, restrain or prohibit, or might result in damages in respect of, this Agreement, the Transaction Documents, or the complete consummation of the Transaction, and which would in the reasonable judgment of IP GEEKS make it inadvisable to consummate the Transaction. No Law shall be in effect and no court order shall have been entered in any Action instituted by any party which enjoins, restrains or prohibits this Agreement or the complete consummation of the Transaction. There shall have been no determination by IP GEEKS, acting in good faith, that the consummation of the Transaction has become inadvisable or impracticable by reason of the institution or threat by any Person or any Governmental Authority of legal Actions against IP GEEKS or Seller.

    (c)    <u>Deliveries</u>. Seller shall have delivered or entered into, or caused to have been delivered or entered into, the documents and instruments contemplated by this Agreement all in form and substance reasonably satisfactory to IP GEEKS and its counsel.

    (d)    <u>Material Adverse Changes</u>. There shall not have been any change or series of changes that, in the commercially reasonable business judgment of IP GEEKS, acting in good faith, shall have a material adverse effect on the Company or Business since the Effective Date.

10

**6.5** **_Conditions to the Obligations of Seller_**. The obligations of Seller to consummate the Transaction are subject to the fulfillment, prior to or at the Closing, of the following additional conditions precedent:

(a) Representations; Warranties; Covenants. Each of the representations and warranties of IP GEEKS contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date, with the same effect as though made on and as of the Closing Date (it being understood that representations and warranties made as of the Effective Date shall also be deemed to have been made as of the Closing Date). IP GEEKS shall, on or before the Closing Date, have performed and satisfied all of its covenants and agreements set forth in this Agreement which by the terms hereof are to be performed and satisfied by IP GEEKS on or before the Closing Date. IP GEEKS shall have delivered to Seller a certificate dated as of the Closing Date certifying to the foregoing effect.

(b) Other Documents. On the Closing Date, Seller shall have received all certificates and documents, which counsel to Seller shall have reasonably requested from IP GEEKS.

(c) No Actions or Proceedings. No Action shall have been instituted or threatened which seeks to enjoin, restrain or prohibit, or might result in damages with respect to, this Agreement or the complete consummation of the Transaction, and which would in the reasonable judgment of Seller make it inadvisable to consummate the Transaction. No Law shall be in effect and no court order shall have been entered in any Action instituted by any party which enjoins, restrains or prohibits this Agreement, the Transaction Documents or the complete consummation of the Transaction. There shall have been no determination by Company or Seller, acting in good faith, that the consummation of the Transaction has become inadvisable or impracticable by reason of the institution or threat by any Person or any Governmental Authority of legal Actions against IP GEEKS, Company or Seller's Principals.

(d) Deliveries. IP GEEKS shall have delivered or caused to have been delivered the Closing Payment and the documents and instruments contemplated by this Agreement all in form and substance satisfactory to Seller.

(e) Material Adverse Changes. There shall not have been any change or series of changes that shall have a material adverse effect on the Company, Business, or Purchaser since the Effective Date, including, without limitation, any development involving the enactment or promulgation of laws.

**6.6** **_Actions Subsequent to Closing_**. At the request of any Party after the Closing, at the requesting Party's sole expense, such other Party shall from time to time execute and deliver or cause to be executed and delivered all further instruments of transfer, assignments, consents or documents as may be reasonably necessary or appropriate in the judgment of the requesting Party to transfer the Acquired Assets to IP GEEKS and/or otherwise to implement the provisions or carry out the purposes of this Agreement.

11

## ARTICLE VII
## NON-COMPETITION AGREEMENT

7.1     ***Definitions***

        7.1.1   "Website Hosting Services" means providing storage for computer files in combination with making said computer files accessible to other computers or devices via the public Internet.

7.2     **7.2** ***Non-Competition Agreement***.

        (a)     Seller and Andrew Auderieth each do hereby agree that during the time period commencing on the Closing Date and ending two (2) years after the Closing Date (the "Covenant Period"), neither Seller nor Andrew Auderieth (collectively, the "Seller Parties" and each a "Seller Party") shall, directly or indirectly, on a Seller Party's own behalf or as a principal, owner, part-owner, owner, partner, investor (other than as a holder solely as an investment of less than one percent (1%) of the outstanding stock of a publicly traded corporation), director, officer, trustee, employee, agent, independent contractor or consultant, or in any other capacity of any person, partnership, entity, firm or corporation or otherwise: (i) except for and on behalf of Company, provide Website Hosting Services, (ii) induce or solicit the clients, customers or any parties or facilities contracted with, serviced by or who have or had an agreement with Company in the last twelve months to terminate, curtail or restrict their relationship with the Company; (iii) induce or solicit or attempt to induce or solicit any person employed or contracted by the Company who will be hired by Purchaser to leave such employment or not fulfill the person's contractual responsibility, whether or not the employment or contracting is full-time or temporary or for a determined period or at will.

        (b)     Each Seller Party acknowledges and agrees that: (i) a breach or threatened breach by either Seller of the provisions of Section 7.2(a) will cause IP GEEKS irreparable harm; (ii) monetary damages in an action at law may not provide an adequate remedy in the event of a breach or threatened breach; and (iii) the restrictions contained in this Section 7.2 are not contrary to public health, safety or welfare. Accordingly, each Seller Party agrees that IP GEEKS shall be entitled to obtain injunctive relief against the breach or threatened breach of the provisions of Section 7.2(a) as well as all other rights and remedies available at law and equity including, without limitation, specific performance (without the necessity of posting a bond or other surety). The non-prevailing party in such action shall pay the reasonable attorneys' fees, expenses and costs incurred in any action based on enforcing any provisions of Section 7.2(a), at pre-trial, trial and appellate levels. Nothing contained in this Section 7.2(b) shall be construed as prohibiting IP GEEKS from pursuing all other remedies available to it for a breach or threatened breach of the provisions of Section 7.2(a).

        (c)     Each Seller Party further acknowledges and agrees that the covenants contained in this ARTICLE VII are necessary for the protection of IP GEEKS's legitimate business interests, and are reasonable in scope and content. In the event of any proven violation by either Seller of any of the provisions of Section 7.2(a), the Covenant Period shall be tolled during the continuation of any breach or violation. Each Seller Party further acknowledges and agrees that the restrictions against competition set forth in this ARTICLE VII are considered by the Parties to

12

be reasonable for the purposes of protecting the legitimate business interests of IP GEEKS, which interests include, without limitation, (i) trade secrets, and other valuable confidential business information that may not qualify as trade secrets to be acquired by IP GEEKS by virtue of the terms and conditions hereof and the consideration paid in connection with this Agreement; (ii) the substantial business relationships with existing and prospective customers and clients and the customer and client goodwill associated with the ongoing business and evidenced by the various trademarks, trade names, service marks and trade dress acquired by IP GEEKS in the Transaction; and (iii) an expectation of continuing patronage from the existing customers and clients of the Company. THE PARTIES FURTHER ACKNOWLEDGE AND AGREE THAT IP GEEKS AND ITS SUCCESSORS OR ASSIGNS ARE EXPRESSLY AUTHORIZED TO ENFORCE THE PROVISIONS OF THIS <u>SECTION 2</u>.

7.3 **7.3** **_Reasonableness of Non-Competition Agreement_**. The Seller Parties acknowledge that the terms of <u>Section 7.2</u> are inherently reasonable in all respects, notwithstanding the fact that the terms of <u>Section 7.2</u> could restrict each Seller Party from earning income in the field in which such party currently works.

7.4 **7.4** **_Severability_**. The invalidity or unenforceability of any one or more of the words, phrases, sentences, clauses, or sections contained in this <u>ARTICLE VII</u> shall not affect the validity or enforceability of the remaining provisions of this <u>ARTICLE VII</u> or any part of any provision, all of which are inserted conditionally on their being valid in law, and in the event that any one or more of the words, phrases, sentences, clauses or sections contained in this <u>ARTICLE VII</u> shall be construed as if that invalid or unenforceable word or words, phrase or phrases, sentence or sentences, clause or clauses, or section or sections had not been inserted or shall be enforced as nearly as possible according to their original terms and intent to eliminate any invalidity or unenforceability. In the event that any provision of Agreement, whether relating to the time period and/or the areas of restriction and/or related aspects, or other restrictions, shall be declared by a court of competent jurisdiction to exceed the maximum restrictiveness such court deems reasonable and enforceable, the time period and/or areas of restriction and/or related aspects deemed reasonable and enforceable by the court shall become and thereafter be the maximum restriction in such regard, and the restriction shall remain enforceable to the fullest extent deemed reasonable by such court. If any invalidity or unenforceability is caused by the length of any period of time or the size of any area set forth in any part of this <u>ARTICLE VII</u>, the period of time or area, or both, shall be considered to be reduced to a period or area, which would cure the invalidity or unenforceability.

**ARTICLE VIII**
**MISCELLANEOUS**

8.1 **_Law Governing_**. This Agreement shall be construed under and governed by New York State Law without regard to the conflicts of laws principles thereof. The Parties hereby submit to the jurisdiction of the State and Federal courts located within the State of Illinois for purposes of all legal proceedings which may arise hereunder or under any of the Transaction Documents, agree that all claims in respect of such action or proceeding may be

13

heard and determined in any such court, and agree not to bring any action or proceeding arising out of or relating to this Agreement or the Transaction Documents in any other court.

      8.2    *__Notices__*.  Whenever any notice, request, information or other document is required or permitted to be given under this Agreement, that notice, demand or request shall be in writing and shall be either hand delivered, sent by United States certified mail, postage prepaid, delivered via overnight courier to the addresses below or to any other address that any Party may specify by notice to the other Parties.  No Party shall be obligated to send more than one notice to each of the other Parties and no notice of a change of address shall be effective until received by the other Parties.  A notice shall be deemed received upon hand delivery, two days after posting in the United States mail or one day after dispatch by overnight courier.

To IP GEEKS:

IP GEEKS, LLC

_____

_____

with a copy, which will not constitute notice, to:

George P. Snead, Esq.
910 Princess Anne Street, 2nd Floor
Fredericksburg, VA 22401
Snead@ParrishSnead.com

To Company:

Datarealm Internet Services, Inc.
309 Empire Builder
Hudson, WI 54016

To Seller's Principal:

Andrew Auderieth
309 Empire Builder
Hudson, WI 54016

or to any other address of which any party may notify the other Parties as provided above.  Each party to this Agreement agrees to promptly notify all of the other Parties to this Agreement of each change of their respective addresses in the manner specified in this Section.

      8.3    *__Prior Agreements Superseded__*.  This Agreement supersedes all prior understandings and agreements among the Parties relating to the subject matter of this Agreement.

      8.4    *__Captions and Gender__*.  The captions in this Agreement are for convenience only and shall not affect the construction or interpretation of any term or provision of this Agreement. The use in this Agreement of the masculine pronoun in reference to a party to this Agreement shall be deemed to include the feminine or neuter pronoun, as the context may require, and

14

whenever the context of this Agreement directs, the plural shall be read as the singular and the singular as the plural.

8.5    ***Execution in Counterparts***.  For the convenience of the Parties and to facilitate execution, this Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document.

8.6    ***Entire Agreement***.  This Agreement, including the Schedules and Exhibits referred to in this Agreement and the other writings specifically identified in this Agreement or contemplated by this Agreement, is complete, reflects the entire agreement of the Parties with respect to its subject matter, and supersedes all previous written or oral negotiations, commitments and writings.  No promises, representations, understandings, warranties and agreements have been made by any of the Parties to this Agreement except as referred to in this Agreement or in its Schedules and Exhibits or in other writings; and all inducements to the making of this Agreement relied upon by either Party to this Agreement have been expressed in this Agreement or in the Schedules or Exhibits or in other writings.

8.7    ***Amendments; Waivers***.  This Agreement may not be amended or modified except by a writing duly and validly executed by each Party to this Agreement.  Any Party to this Agreement may waive any covenant or condition intended for its benefit in its discretion, but delay on the Party of any Party in exercising any right, power or privilege in this Agreement shall not operate as a waiver thereof, nor shall any waiver on the part of any Party of any such right, power or privilege, preclude any further exercise thereof or the exercise of any other such right, power or privilege.  All waivers to be effective shall be in writing signed by the waiving Party.

8.8    ***Construction***.  This Agreement shall be construed without regard to any presumption or other rule requiring construction against the Party causing this Agreement to be drafted, including any presumption of superior knowledge or responsibility based upon a Party's business or profession or any professional training, experience, education or degrees of any member, agent, officer of employee of any Party.

8.9    ***Litigation; Prevailing Party***.  In the event of any litigation, including appeals, with regard to this Agreement, the prevailing Party shall be entitled to recover from the non-prevailing Party all reasonable fees, costs, and expenses of counsel (at pre-trial, trial and appellate levels).

8.10    ***Survival***.  All of the respective representations and warranties of the Parties to this Agreement or in any certificate delivered by any Party incident to this Agreement are material and may be relied upon by the party receiving the same and shall survive beyond the date of this Agreement for a time period equal to the applicable statutes of limitations (after giving effect to any extensions or waivers).  All statements in this Agreement shall be deemed representations and warranties.  The due diligence investigations conducted by the Parties to this Agreement and the results thereof shall not diminish or otherwise affect any of the representations and warranties set forth in this Agreement.

15

8.11   ***Further Assurances***.   The Parties shall execute all other documents or instruments and shall take all other actions as may be reasonably requested by the other to effect the purposes of this Agreement.


*[The rest of this page has intentionally been left blank.  Signature page follows.]*

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as an agreement under seal as of the date first above written.

**PURCHASER:**

IP GEEKS, LLC

By:
Name: Robert Fraser
Its: President of Acquisitions

*[handwritten: for IP Geeks / for Owsren Holdings / CEO Owsrend Holdings, LLC / Owner of IP Geeks LLC]*

**SELLER:**

Datarealm Internet Services, Inc.

By: *[signature]*    4/10/18
Name: Andrew Auderieth
Its: President and CEO

**SELLER'S PRINCIPAL:**

*[signature]*    4/10/18
Andrew Auderieth

17

<u>Schedule 1.1</u>

<u>Fixed Assets</u>

Additional Servers:

Supermicro MicroCloud with 5x Xeon E3 blades (8 blade capacity)

Several File servers

Networking Gear:

2x Brocade FCX624S Routers

30+ Switches (variety of 48 port 100Mbps/1Gbps HP and DLink switches)

32+ APC AP7932 30A PDUs

Cisco ASA Firewalls

An electronic Excel spreadsheet of hardware containing 648 rows of data, generated on March 27, 2018, and delivered via email, is incorporated herein by reference. ("Server List")

Schedule 1.1(a)

Excluded Assets

1.      Dell laptop computer in Andrew Auderieth's possession in Hudson, WI

2.      HP mini-desktop computer and Crossover monitor in Andrew Auderieth's possession in Hudson, WI

3.      Epson Printer in Andrew Auderieth's possession in Hudson, WI

4.      Google Wifi Routers in Andrew Auderieth's possession in Hudson, WI

5.      Apple Mac Mini computer and monitor in Melissa Parker's possession in Philadelphia, PA

6.      Cisco 9620 VOIP telephone in Melissa Parker's possession in Philadelphia, PA

7.      AT&T Cell Phones and Plan including:

      i.      715.531.7445 (iPhone X)

      ii.      612.414.8411 (iPhone X)

      iii.      612.999.3579 (iPhone X)

      iv.      715.808.5118 (iPhone X)

      v.      715.808.9432 (iPhone X)

8.      Minnesota Timberwolves Season Tickets

9.      Domain Names:

      i.      auderieth.com

      ii.      joylynn.net

      iii.      Rfultimate.com/org

      iv.      Rful.org

      10.

11.

19

Schedule 1.2

URLs

Anydomain.com

Virtualdedicated.net

Hostingforgeeks.com/net

Freemachines.net

Datarealm.co

Datarealm.com/net

Rackmounted.com/net

Virtual-dedicated.net/com

Thehostcompany.com/net

Minerva.net

Schedule 2.4

Allocation of Purchase Price

Fixed Assets and Equipment:      $___$45,000.00_____

URLs:                            $___$5,000.00_____

Other Intangible Property:       $___$0.00      _____

Goodwill:                        $___$286,000.00_____

Noncompetition Agreements:       $___$264,000.00_____


Total:                           $600,000.00

21

Schedule 3.6

Intellectual Property

- Custom code developed by Seller, which is on the servers being acquired;
- The following licenses:
    - cPanel
    - windows SPLA
    - WHMCS